**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22 CR 240 |
| | ) | Judge Gettleman |
| GLEN PRINCE., | ) | |
| Defendant. | ) | |

**GLEN PRINCE'S MOTION TO DISMISS INDICTMENT AS
UNCONSTITUTIONAL UNDER THE SECOND AMENDMENT**

GLEN PRINCE., by the Federal Defender Program and its attorney IMANI

CHIPHE, moves according to Rule 12(b)(1) of the Federal Rules of Criminal

Procedure to dismiss the indictment against him. Mr. Prince, Jr. is charged

pursuant to 18 U.S.C. § 922(g)(1) with possessing a firearm after sustaining a

felony conviction. As applied to the facts of this case and facially, § 922(g)(1) is

unconstitutional. In *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111

(2022), the Supreme Court adopted a narrowed "text and tradition" approach to

the Second Amendment's scope. This approach is explained in detail in *Atkinson*

*v. Garland*, 70 F.4th 1018 (7th Cir. 2023), and *Range v. Att'y Gen. United States of*

*Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc). Following this approach to its

logical conclusion, as those cases do, compels the conclusion that § 922(g)(1) is

unconstitutional in Mr. Prince, Jr.'s case. This Court should dismiss the

indictment with prejudice.[1]

## PROCEDURAL BACKGROUND

The government obtained an indictment against Mr. Prince. On April 25,

2022, charging him with violating 18 U.S.C. § 922(g)(1) and 924(e(1). Dkt. 1. Mr.

Prince, Jr. was arrested and had his initial appearance and arraignment on May

24, 2022. Dkt. 15. He was ordered detained. The government filed a superseding

indictment on June 27, 2023.[2]

On June 7, 2023, the Third Circuit became the first federal appellate court

to hold 18 U.S.C. § 922(g)(1) unconstitutional in an as-applied challenge. *See*

*Range*, 69 F.4th 96. In a thorough en banc decision, the *Range* opinion interpreted

the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v.*

*Bruen*, 142 S. Ct. 2111 (2022). Subsequently, on June 20, 2023, the Seventh Circuit

issued its opinion in *Atkinson v. Garland*, No. 22-1557, where it held that the

government's historical analysis of the constitutionality of Section 922(g)(1) fell

"well short of *Bruen*'s demands." Because *Atkinson*'s decision under review and

---

[1]  "Federal Rule of Criminal Procedure 12(b)(1) permits pretrial motions raising 'any defense' that can be adjudicated without a trial." *United States v. Stelmachowski*, No. 15 CR 339-1, 2018 WL 828078, at *6 (N.D. Ill. Feb. 12, 2018) (St. Eve, J.). A defendant's as-applied constitutional challenge to an indictment is properly raised as a motion to dismiss under Rule 12(b)(1). *Id.*

[2]  Mr. Prince has not been arraigned on the superseding indictment.

briefing on appeal pre-dated *Bruen*, the Seventh Circuit remanded the case to allow the government to attempt to provide more persuasive historical evidence, although the government had rejected an invitation for remand at oral argument after *Bruen*. Nonetheless, *Atkinson* was clear that the record before it was insufficient to "affirmatively prov[e] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 70 F.4th 1020 (quoting *Bruen*, 142 S. Ct. at 2127).[3] As a result of these developments, Mr. Prince, Jr. moves to dismiss the indictment against him.

## ARGUMENT

Recent appellate and Supreme Court authority makes clear that § 922(g)(1) is unconstitutional facially and as applied to Mr. Prince, Jr. In *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court explicitly abrogated the "intermediate scrutiny" framework that many appellate courts, including the Seventh Circuit, had previously applied to Second Amendment challenges as "one step too many." *Bruen,* 142 S. Ct. at 2127 (rejecting the two-step test set out in *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). In its place, the *Bruen* Court explained that

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The

---

[3] The Eighth Circuit has come to the opposite conclusion of the en banc *Range* court and found the government's historical evidence to be sufficient to support the constitutionality of Section 922(g). *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). But while Judge Wood's dissent in *Atkinson* would have followed the Eighth Circuit's lead, the *Atkinson* majority refused to do so. *See ante* at 14.

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 51 n.10 (1961)). The Seventh Circuit acknowledged *Bruen*'s abrogation of *Kanter* in *Atkinson*, explaining that the government may only defend the constitutionality of a gun regulation "by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" *Atkinson,* 70 F.4th at 1020 (citing *Bruen*, 142 S.Ct. at 2126).

Here, Mr. Prince's  conduct—the possession of a firearm—is covered by the plain text of the Second Amendment and is presumptively protected by the Constitution. He is part of "the people" who are protected. The government can therefore only prevail if it can "*affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 142 S.Ct. at 2127 (emphasis added). It cannot. The historical record from the time of the founding demonstrates the exact opposite: that felons who completed their punishments were allowed to possess firearms just like any other member of the community. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 283–285 (2020) (collecting examples of this). Laws prohibiting felons from bearing arms did not begin to appear until the twentieth century. *See*

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."). The charge against Mr. Prince, Jr. is therefore unconstitutional.

**A.    The plain text of the Second Amendment covers conduct criminalized by Section 922(g)(1).**

The Second Amendment protects "the right of the people to keep and bear arms[.]" U.S. Const. amend. II. As the Supreme Court has explained, this plain language "guarantee[s] the individual right to possess and carry weapons[.]" *D.C. v. Heller*, 554 U.S. 570, 592 (2008). Supreme Court precedent shows that individuals who have prior felony convictions are part of "the people" protected by the Second Amendment.

As *Heller* explained, "the people" is a term of art, and appears not just in the Second Amendment, but in the First, Fourth, Ninth, and Tenth Amendments as well. *Id.* at 579. The repeated use of this term reflected a consistent meaning—namely, that these instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id.* Based on this, *Heller* held that the language of the clause creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Just as Mr.

Prince retains his right to petition the government or be protected from unlawful searches and seizures, he is covered by the Second Amendment as well.

While the *Heller* decision also included dicta suggesting the Second Amendment's protection was for "law-abiding, responsible citizens," *id.* at 635, the Seventh Circuit has already rejected the argument that this dicta limits the Second Amendment's application. In *United States v. Meza-Rodriguez*, issued before *Bruen*, the Seventh Circuit held that:

> While some of *Heller*'s language does link Second Amendment rights with the notions of "law-abiding citizens" and "members of the political community," *see Heller*, 554 U.S. at 580, 625, 128 S.Ct. 2783, those passages did not reflect an attempt to define the term "people." We are reluctant to place more weight on these passing references than the Court itself did.

*United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). Instead — following the core, actual holding of the *Heller* decision — the Seventh Circuit has concluded that "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights[.]" *Id.* at 670.

While *Bruen* contains similar dicta, nothing in that decision casts doubt on the understanding articulated in *Meza-Rodriguez*. The Seventh Circuit rejected this reading in *Atkinson*. 70 F.4th at 1022 (rejecting the government's reliance on this "oft-quoted dicta" and holding that "[n]othing allows us to sidestep *Bruen*" in that way). Rather, *Bruen* reiterated *Heller*'s holding that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used

6

arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142
S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581).

The Third Circuit reached this same conclusion in its recent *en banc*
opinion in *Range*. 69 F.4th at 101-103. The Third Circuit cited four reasons why
the "law-abiding" language from these opinions does not compel a conclusion
that felons fall outside the "people" covered by the Second Amendment. First,
the criminal histories of the plaintiffs in *Heller*, *McDonald v. Chicago*, 561 U.S. 742,
780 (2010), and *Bruen* were not at issue. *Id*. at 101. Second, the court pointed to
*Heller's* discussion of the term "the people" in multiple amendments. It reasoned
that "[u]nless the meaning of the phrase 'the people' varies from provision to
provision—and the Supreme Court in *Heller* suggested it does not—to conclude
that Range is not among 'the people' for Second Amendment purposes would
exclude him from those rights as well." *Id*. at 102. The *Range* court saw "no
reason to adopt an inconsistent reading of 'the people.'" *Id*.

Third, the *Range* court cited then-Judge Barrett's reasoning in her dissent in
*Kanter v. Barr*, 919 F.3d at 452, where she "persuasively explained that 'all people
have the right to keep and bear arms,' though the legislature may
constitutionally 'strip certain groups of that right.'" *Id* at 102. The Third Circuit
also reaffirmed its prior precedent stating that the idea that "individuals with
Second Amendment rights may nonetheless be denied possession of a firearm [in

some circumstances] is hardly illogical." *Id.* (citing *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 344 (3d Cir. 2016)); *see also United States v. Rahimi*, 61 F.4th 443, 451-52 (5th Cir. 2023).

Finally, the *Range* court pointed to the expansiveness of the phrase "law-abiding," reasoning that the Supreme Court could not have meant that any individual who ever ran afoul of any law, however minor and in any circumstance, could be excluded from the protections of the Second Amendment. *Range*, 69 F.4th at 102. It also took issue with the vagueness of the phrase "responsible," noting that such a term was susceptible to many different interpretations. *Id.*; *see also Rahimi*, 61 F.4th at 453 ("Under the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? One easily gets the point[.]").

Ultimately, the Third Circuit rejected the government's characterization of the scope of "the people" covered by the Second Amendment because such a narrow reading would essentially delegate to the legislature who receives the protection of the Second Amendment, which would be no protection of the right at all. Consistent with *Meza-Rodriguez*, *Atkinson*, *Range*, the Second Amendment extends to individuals with prior felony records, including Mr. Prince, Jr.

8

**B.    The government cannot carry its burden to establish that Section 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."**

Because the plain text of the Second Amendment covers the simple possession by a felon criminalized by Section 922(g)(1), the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *Atkinson*, 70 F.4th at 1022.[4] The government cannot meet that burden. The historical record demonstrates that there is no historical tradition of preventing felons from possessing guns, only a very modern one.

In its very recent *Atkinson* decision, the Seventh Circuit confronted a record and briefing developed before the *Bruen* opinion was issued. In deciding to remand to the district court for further briefing, the Seventh Circuit acknowledged that "the government's brief before us includes some historical analysis," but stated that the record was "nothing close to what would satisfy the demanding standard set forth in *Bruen*" and "falls well short of *Bruen*'s demands." *Atkinson*, 70 F.4th at 1022. The government had provided the court with "some Founding era commentary," and explained that "that felons … were

---

[4]    As noted above, prior to the Supreme Court's opinion in *Bruen*, the Seventh Circuit rejected challenges to § 922(g)(1) under the two-part means-end inquiry, determining that the historical record on felons possessing firearms was "inconclusive." *See, e.g., Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Hatfield v. Barr*, 925 F.3d 950 (7th Cir. 2019). The means-end test was abrogated in *Bruen* to solely the historical inquiry.

historically subject to execution and estate forfeiture, as well as the loss of other civic rights." *Id.* But in light of the *Atkinson* court's statement this type of information "falls well short of *Bruen's* demands," *id.*, the burden is on the government to make an even more substantial showing before this court.

The government will be unable to do so. The historical evidence instead shows a lack of any tradition restricting felons from gun ownership. In the early American republic, there were no laws that prohibited ex-felons from possessing firearms after they had completed their punishment. *See*, *e.g.*, Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 127 (2013) ("the federal felon-firearm prohibition only dates back to 1938, and nonviolent felons were not prevented from possessing firearms until the enactment of the 1968 [Gun Control Act]"); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). Two prescient dissents from the pre-*Bruen* era—both of which predicted *Bruen* and exhaustively canvassed the historical record—firmly demonstrate that felon-in-possession laws do not have historical support. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("at least thus far, scholars have not been able to identify any such laws" barring felons from possessing firearms); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting) ("I cannot find, and the majority does not cite, any case or statute from that era that imposed or authorized such bans.").

Under *Bruen*, that lack of regulation is itself entitled to substantial weight. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. That is exactly the situation here. Crime, both violent and not, recidivism, public safety, and firearms possession are general societal problems and issues that have existed throughout history. Yet American society did not respond to these problems by barring felons from possessing guns for over one hundred and fifty years after the Founding. Blanket felon dispossession is simply a modern practice, not a historical one.

This is the exact conclusion the Third Circuit reached in *Range*. There, the government and amici relied on 1938 and 1961 laws restricting firearm ownership, among others. The Third Circuit rejected these modern laws as analogs. It was "confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." 69 F.4th at 104. And it expressed extreme doubt about the relevance of the Federal Firearms Act of 1938, which

only covered a narrow set of violent crimes and not the plaintiff's[5]—"a dubious proposition given the *Bruen* Court's emphasis on Founding-and-Reconstruction era sources." *Id.*; *see also Bruen*, 142 S.Ct. at 2154 n.28 ("20th century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

Nor did the Third Circuit accept other, older "status-based" historical analogs proffered by the government that prohibited firearm ownership based on race and religion. These laws prohibited firearms possession by marginalized social groups, such as Loyalists, Native Americans, Quakers, Catholics, and Blacks." *Id.* at 105. Of course, the *Range* court noted, those restrictions would be flatly unconstitutional today, limiting their historical value. And second, the government was required to analogize those prohibited groups to the individual at issue (in that case, Mr. Range), but failed to show any such analogy to § 922(g)(1). *Id.* at 104-105.

Finally, the *Range* opinion rejected the government's argument that because the founding-era practice was for every felony to be punishable by death, any other punishment is therefore constitutional. "The greater does not necessarily include the lesser," the Third Circuit reasoned, and if a person was

---

[5]    The Firearms Act of 1938 included murder as a crime of violence but did not include conspiracy.

not executed—and therefore remained covered by the Second Amendment—the government provided no historical practice dispossessing that person any more than they could strip them of their freedom of speech. *Id.*; *see also Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting) ("we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution"). This absence is especially notable because while felonies were punishable by death, execution was in practice the minority form of punishment by the time of the Founding and accounted for less than a quarter of the sentences in felony convictions. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immgr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound for America: The Transportation of British Convicts To The Colonies* 1718–1775, at 21 (1987)), *see also Kanter*, 919 F.3d at 461–62. In any event, the purpose of an execution was of course not to deprive one of his access to firearms. On the contrary, a felon could repurchase arms after his sentence. *Range*, 69 F.4th at 104. In short, the government failed to carry this burden as to Mr. Range and must be held to that same strict burden for Mr. Prince, Jr.

The government will undoubtedly note in response that the majority opinion in *Range* included language stating that its opinion was a "narrow" one. *Id.* at 106. This is understandable given the narrow question directly presented in

13

the case before it. The historical tradition canvassed, however, is equally applicable here in its total lack of support for Founding-era restrictions. Nothing in the body of the *Range* opinion relies on the nature of the prior conviction, and the en banc Court does not discuss any distinct reasoning or considerations that might change with a different prior offense. This is for a simple reason: as the government provided insufficient support for any historical tradition of felon firearms dispossession whatsoever, the nature of the felony is naturally immaterial. Moreover, the *Range* dissent recognized exactly this, observing that "the analytical framework [the majority has] applied to reach their conclusion renders most, if not all, felon bans unconstitutional." 69 F.4th at 113 (Shwartz, J., dissenting).

This Court should apply that same analytical framework, and arrive at the same inevitable conclusion that, under the Supreme Court's "text and tradition" approach to the Second Amendment, Section 922(g)(1) is unconstitutional both facially and as applied to Mr. Prince, Jr.

**C.** **The Eighth Circuit's decision in *United States v. Jackson* is wrong and does not chart a relevantly similar historical tradition.**

Unlike *Range,* the Eighth Circuit came to the opposite conclusion in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). In *Jackson,* the defendant was convicted at trial and raised his constitutional challenge on appeal, which the Eighth Circuit rejected. In doing so, the Court made two errors. First, *Jackson*

relied in significant part on the Third Circuit's withdrawn panel opinion in *Range*, which was withdrawn in favor of its en banc decision going the other way. And second, the Eighth Circuit made the very missteps that the en banc *Range* opinion, and then-Judge Barrett before it, carefully showed the errors of, relying on a flawed set of status-based historical dispossessions to support the materially distinct felon in possession ban at issue here.

In upholding § 922(g)(1), the Eighth Circuit relied on the status-based firearms dispossession laws that stripped specific social groups, such as Catholics, Native Americans, or Loyalists, reasoning that these groups allowed for any group of people a legislature deems to be a threat to "orderly society" or "dangerous" to be prohibited from possessing a firearm. *Jackson*, 69 F.4th at 503–505. This, the Eighth Circuit reasoned, leaves it up to the legislatures to determine what groups of people may be relieved of their Second Amendment rights, and that someone convicted of a prior felony is sufficiently analogous to support the constitutionality of § 922(g)(1) after *Bruen*. *Id.* at 505.

In adopting this reasoning, however, the Eighth Circuit never confronts the problems with this status-based reasoning that have already been raised. It acknowledges but never addresses the concern that virtually all of these prohibitions were the product of deep social bigotry and would be unconstitutional today. *Id.* at 503; *see supra* at 11. And more significantly, the

15

Eighth Circuit never reckons with the implication of these laws' existence concerning the lack of a historical § 922(g)(1) analog. These status-based laws show that the Founders and Legislatures were aware and took action regarding the use of firearms in relation to distrusted social groups at the time, but felons were *never* categorically dispossessed. *See, e.g., Kanter,* 919 F.3d at 457–58 (Barrett, J., dissenting) (charting the history of these dispossessions). This is fatal to the analysis under *Bruen*. 142 S.Ct. at 2131. And, as the *Range* court explained, the claim that § 922(g)(1) is constitutional because other minority social groups may have been regulated is simply "far too broad" to support the relevant historical analogy here. Just as the Supreme Court did not find that a historical tradition to regulate firearms in "sensitive places" allowed a legislature to simply designate any place a "sensitive" one, the fact that some groups were dispossessed at the founding does not mean that *any* group can be so dispossessed, and for any reason. 69 F.4th at 105 (quoting *Bruen*, 142 S.Ct. at 2134). And just because some founding-era laws prohibited some forms of public carry, that did not mean that a law could "ban public carry altogether." *Bruen*, 142 S.Ct. at 2147. So too here.

## CONCLUSION

Mr. Prince is covered by the plain text of the Second Amendment. The historical record demonstrates that laws prohibiting felons from possessing arms did not appear until the 20th Century. At the time that the Second Amendment

was ratified, there was not a single felon-in-possession law on the books. Nor was there even a firearms restriction tied to criminality more generally. In stripping Mr. Prince of his Second Amendment rights based purely on his prior conviction of a felony offense, § 922(g)(1) violates the historical tradition of the Second Amendment and is unconstitutional. The indictment must be dismissed.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By:    /s/ *Imani Chiphe*
Imani Chiphe
Attorney for Glen Prince

IMANI CHIPHE
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-2029

17

## CERTIFICATE OF SERVICE

The undersigned, <u>Imani Chiphe</u>, attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## GLEN PRINCE'S MOTION TO DISMISS INDICTMENT AS UNCONSTITUTIONAL UNDER THE SECOND AMENDMENT

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>August 17, 2023</u>, to counsel/parties that are non-ECF filers.

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: <u>s/Imani Chiphe</u>
        Imani Chiphe

IMANI CHIPHE
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-2029