**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22 CR 240 |
| | ) | Judge Robert W. Gettleman |
| GLEN PRINCE, | ) | |
| Defendant. | ) | |

## GLEN PRINCE'S REPLY IN SUPPORT OF MOTION TO DISMISS

Respectfully submitted,

Federal Defender Program
John F. Murphy,
Executive Director

By:    /s/ *Imani Chiphe*
Imani Chiphe
Attorney for Glen Prince

1

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... 2

INTRODUCTION........................................................................................... 4

ARGUMENT................................................................................................... 6

I.     Mr. Prince is part of "the people" protected by the Second Amendment. .......... 7

II.    The government has failed to demonstrate a historical tradition of permanently disarming felons. ............................................ 12

       A.    Because the government cites no evidence of any historical felon dispossession laws prior to the 20th Century, it has failed to demonstrate a tradition of "distinctly similar" regulations................................................. 14

       B.    Even if the Court applies the less exacting "relevantly similar" standard, the government has failed to meet it. ......................... 16

             i.    *There is no historical tradition of disarming "untrusted groups." The examples that the government offers differ substantially from Section 922(g)(1) both in purpose and in the extent of the burden they place on the Second Amendment right.* ........................................................... 18

                  a) Discriminatory English laws disarming Catholics do not support disarming Mr. Prince. .................................. 20

                  b) Discriminatory colonial laws disarming the enslaved, warring Indian tribes, and religious minorities do not support disarming Mr. Prince............................................. 21

                  c) Revolutionary war measures that disarmed or banished British loyalists do not support disarming Mr. Prince. ........................................................................... 25

                  d) Failed proposals from the state ratification conventions do not support disarming Mr. Prince. ......................... 26

              ii.   *The mere existence of the death penalty does not authorize the government to permanently strip away a person's fundamental rights after the completion of a sentence.* ....................................... 28

III.     The issues that the Seventh Circuit raised in *Atkinson*
         weigh in favor of finding Section 922(g) unconstitutional
         as applied to Mr. Prince. ............................................................................ 30

**CONCLUSION** .................................................................................................... 33

## INTRODUCTION

Under *Bruen*, the government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022). The government has not come close to meeting this burden in Mr. Prince's case.

The government's response brief fails to cite an example of any law that permanently prohibited felons from possessing firearms at any point in the nation's history before the 20th Century. That is a glaring omission—especially because the government concedes that Section 922(g)(1) addresses a "general societal problem that has persisted since the 18th century." Resp. at 30 (quoting *Bruen*, 142 S. Ct. at 2131). It is also worth noting that the government has decided not to submit a declaration from an expert historian or to put on testimony in this case. *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023) ("the most disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws"). The government's decision is not surprising—an academic historian cannot invent a historical tradition where none exists—but it is telling.

Instead of presenting evidence about felons, the government attempts to create a historical tradition where none exists. The government asserts—without any supporting evidence—that colonial-era laws disarming enslaved people, warring Indian tribes, Catholics, and British loyalists prove that the government possesses an undefined and

4

unlimited power to disarm anyone who it deems to be an "untrustworthy adherent to the law[.]" Resp. at 17. But the government can only reach this self-serving conclusion by examining those laws outside their historical context and smuggling in the government's own (entirely modern) judgments about who should and who should not be allowed to bear arms. This effort to revise the historical record is not the sort of exacting analysis that *Bruen* demands.

The government's historical examples all fail for the same reason. Colonial societies disarmed the enslaved, warring Indians, religious minorities, and British loyalists either because they regarded those groups as beneath the rights of citizenship or because they regarded them as seditious enemies of the state. But even if colonial societies disarmed those specific groups,[1] these same societies treated ex-felons very differently.

The historical record demonstrates that—before 1968—American society did not punish felons by permanently depriving them of the right to bear arms. Certainly, some felons were punished with the death penalty. But most were not. The government has not produced a single historical example of a felon who completed his sentence and returned to the community but was nevertheless denied the right to bear arms.

That history decides this case. Supreme Court and Seventh Circuit precedent establish that remains part of "the people" protected by the Bill of Rights. Because of that, and because there is no historical tradition of permanently disarming felons like Mr.

---

[1]     It is more accurate to say that these groups were subject to some restrictions on their ability to bear arms, but were not completely or permanently disarmed.

Prince, the Court must dismiss the Indictment with prejudice.

**ARGUMENT**

In many respects, the parties agree on the governing legal standard. As the government acknowledges, *Bruen* established a two-step "text and history" test for assessing Second Amendment challenges to the constitutionality of a gun regulation. Resp. at 6. At the first step, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–2130.

In the second step, *Bruen* sets forth two avenues of historical inquiry. On the one hand, when the "challenged regulation addresses a general societal problem that has persisted since the 18th century," courts should conduct "a straightforward historical inquiry." *Bruen*, 142 S. Ct. at 2129. In this situation, the government must cite evidence of a "*distinctly similar* historical regulation addressing that problem" to demonstrate the constitutionality of the modern law. *Id.* (emphasis added).

On the other hand, the Supreme Court held that a broader inquiry is appropriate in situations where the modern gun law was motivated by "unprecedented social concerns or dramatic technological changes." *Id.* at 2132. In that situation—when dealing with "modern regulations that were unimaginable at the founding"—*Bruen* allows courts to reason by analogy and consider laws that are merely "relevantly similar." *Id.*

Here, the parties agree that Section 922(g) addresses a "general societal problem that has persisted since the 18th century." Resp. at 30 (quoting *Bruen*, 142 S. Ct. at 2131). As a result, the government can only prevail if there is evidence of *distinctly similar*

historical regulations. The government is unable to make that showing. While it offers far-fetched and unpersuasive analogies—comparing Mr. Prince to enslaved individuals, religious minorities, and British loyalists during the time of the Revolutionary War—the government's elaborate and self-motivated reasoning does not come close to satisfying the "straightforward historical inquiry" that the parties agree that the Court must conduct.

I. **Mr. Prince is part of "the people" protected by the Second Amendment.**

While the government attempts to argue that Mr. Prince is not part of "the people" protected by the Second Amendment, the government does not attempt to ground this argument in the actual language of the Constitution. Indeed, the plain meaning of the Second Amendment would preclude any such argument. At the time of the founding, the term "the people" did not exclude those with felony records. To the contrary, the term "signifie[d] every person, or the whole collection of inhabitants in a nation or kingdom[.]" Thomas Dyche & William Pardon, A New General English Dictionary (14th ed. 1771), available at https://tinyurl.com/uk4b4fxd;[2] *see also* 2 Samuel Johnson, A Dictionary of the English Language 306 (1766) (defining "people" as "[a] nation; those who compose a community"), available at https://tinyurl.com/y95erjwf.

Without any basis in the constitutional text, the government's "textual" argument instead rests entirely on *dicta* in the Supreme Court's *Heller* and *Bruen* decisions. But the

---

[2] The 1771 Dyche and Pardon dictionary is, unfortunately, unpaginated in the original. The quoted definition of "people" can be found on page 639 of the PDF file available at the attached link.

government badly misreads both decisions. As Mr. Prince has already discussed, *Heller* recognized a "strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans.*" *D.C. v. Heller*, 554 U.S. 570, 581 (2008) (emphasis added); *see also* Mot. at 5–6 (discussing *Heller* in additional detail). *Bruen* reached the same conclusion, explaining that "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581 (emphasis added)).

The government ignores these central holdings from *Heller* and *Bruen*. Instead, by relying on a smattering of academic articles, the government argues that the right to bear arms should be limited to "First-Class Citizens" and restricted in the same way as civic rights like jury service, voting rights, and holding public office. Resp. at 11 (quoting Akhil Reed Amar, The Bill of Rights 48 (1998)). But this argument stumbles out of the gate. The central premise of Professor Amar's argument—that the Second Amendment protects a collective, civic right rather than an individual right—was decisively rejected by *Heller*. *See Heller*, 554 U.S. at 579 (holding that the Second Amendment, like the First and Fourth Amendments, "unambiguously refer[s] to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body."). While Professor Amar is not bound by Supreme Court precedent, this Court is.

The government's reference to Thomas Cooley's 1868 treatise reveals the same fundamental error. While Cooley did endorse restrictions barring felons from *voting*, the passage that the government quotes "doesn't say anything about the right to keep and bear arms." *United States v. Harrison*, 2023 WL 1771138, at *13 (W.D. Okla. Feb. 3, 2023).

8

Indeed, Cooley's treatise contains a separate section "exclusively devoted to the right to keep and bear arms," and that section "says nothing about the exclusion of felons." *Id.* at *13 n.69 (internal citation omitted). In other words, Cooley's treatise is entirely consistent with the distinction that the Supreme Court recognized in *Heller*: collective or civic rights, like the right to vote, may be restricted to a subset of the people. But individual rights, like those protected by the First and Second Amendments, cannot be. Those rights belong—not to the lucky few whom the government deems to be "First-Class Citizens"—but to all Americans.

Finally, the government tries to bolster its "textual" argument by relying extensively on *dicta* in *Heller* and *Bruen*. But the government's mode of analyzing those two cases is distinctly odd. As discussed above, the government ignores the actual holdings of *Heller* and *Bruen*. *See supra* at 8. Instead of engaging with the reasoning of these decisions, the government urges the Court to simply count up the number of times each opinion used phrases like "law-abiding citizens." *See* Resp. at 14 (counting 14 examples in *Bruen*).[3] But multiple circuit courts—including the Seventh Circuit—have

---

[3]     The government also briefly argues that *Bruen* implicitly blessed felon-in-possession bans because it endorsed "shall-issue" licensing schemes, "many of which prohibit the issuance of licenses to felons[.]" Resp. at 13. But "the *Bruen* Court did not rule on the constitutionality of 43 specific state licensing regimes because that was not the issue before the Court. *See Bruen*, 142 S. Ct. at 2138 n.9. Rather, the Court merely blessed the general concept of shall-issue regimes." *United States v. Rahimi*, 61 F.4th 443, 451 n.5 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) ("Nothing allows us to sidestep *Bruen* in the way the government invites. Yes, the Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry

found that "those passages did not reflect an attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc); *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023).[4]

The government's only response to the Seventh Circuit's decision in *Meza-Rodriguez* is to say that "*Meza-Rodriguez* was written before *Bruen*." Resp. at 15. That is true, but irrelevant. *Meza-Rodriguez* concluded that *Heller*'s repeated short-hand references to "responsible, law-abiding citizens" did not reflect an attempt to restrict the scope of the Second Amendment. *Meza-Rodriguez*, 798 F.3d at 669. So while *Bruen* included similar short-hand references, there is no substantive analysis in *Bruen* that could alter the result that the Seventh Circuit already reached in *Meza-Rodriguez*. *See*

---

permit. But in no way did the Court suggest that its observation resolved cases like the one Atkinson brought challenging § 922(g)(1).").

[4] *See also, e.g., United States v. Savage*, 21 CR 631 (N.D. Ill. June 5, 2023) (Dkt. 54); *United States v. Ware*, No. 22-CV-30096-SPM, 2023 WL 3568606, at *5 (S.D. Ill. May 19, 2023); *United States v. Lowry*, No. 1:22-CR-10031-CBK, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023); *United States v. Martin*, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023); *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *6 (E.D. Tex. Jan. 27, 2023); *United States v. Hester*, No. 1:22-cr-20333-RNS (S.D. Fla. Jan. 27, 2023) (Dkt. 39); *Campiti v. Garland*, No. 3:22-CV-177 (AWT), 2023 WL 143173, *3 (D. Conn. Jan. 10, 2023); *United States v. Goins*, No. 522CR00091GFVTMAS1, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022); *United States v. Carbajal-Flores*, 20-cr-613 (N.D. Ill. Dec. 19, 2022) (Dkt. 74); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022); *United States v. Pierre*, No. 1:22-cr-20321- JEM (S.D. Fla. Nov. 28, 2022) (Dkt. 53); *United States v. Williams*, No. 1:21-cr-362-LMM, 2022 WL 18285005, *2 (N.D. Ga. Nov. 14, 2022); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022); *United States v. Coombes*, No. 22-CR-00189- GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022).

*United States v. Carbajal-Flores*, 20-cr-613 (N.D. Ill. Dec. 19, 2022) (Dkt. 74 at *4) ("Contrary to the government's argument, *Bruen*'s characterization of petitioners as 'law-abiding citizens' does not control this Court's interpretation of 'the people' covered by the Section Amendment. Similar arguments were made and rejected in *Meza-Rodriguez.*").

The Seventh Circuit recently reiterated that this dictum does not supersede the need for full *Bruen* analysis in *Atkinson*, where the government asked the court to "sidestep *Bruen*" by simply invoking *Heller's* "oft-quoted dicta." *Atkinson*, 70 F.4th at 1022. The court declined, concluding it must "roll[] up its sleeves" and "undertake the text-and-history inquiry the [*Bruen*] Court so plainly announced and expounded upon at great length." *Id.* This Court must do the same. *See also Range*, 69 F.4th at 103-04 (rejecting the government's request to uphold § 922(g)(1) based on *Heller's* dictum); *Bullock*, 2023 WL 4232309, at *18 (dismissing "presumptively lawful" dictum as "'judicial lawmaking'" and declining to follow it because "[f]ederal courts are only permitted to rule upon an actual 'case or controversy,' and lack jurisdiction to render merely advisory opinions beyond the rulings necessary to resolve a dispute," as *Heller* did).

Finally, there is a practical reason not to adopt the government's "law-abiding, responsible citizens" standard: It is hopelessly vague and unworkable. *Range*, 69 F.4th at 102; *see also Rahimi*, 61 F.4th at 453 ("the Government's proffered interpretation of 'law-abiding' admits to no true limiting principle"); *Bullock*, 2023 WL 4232309, at *29 (quoting *Range*, 69 F.4th at 102). Thus, adopting a "law-abiding, responsible citizens" limitation "devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69 F.4th at 102. That approach—which "gives legislatures unreviewable power to

11

manipulate the Second Amendment by choosing a label"—conflicts with *Bruen's* "warning against 'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2131).

Mr. Prince is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is, therefore, among "the people" protected by the Second Amendment.

## II. The government has failed to demonstrate a historical tradition of permanently disarming felons.

The parties agree that Section 922(g)(1) addresses a "general societal problem that has persisted since the 18th Century." Resp. at 30 (quoting *Bruen*, 142 S. Ct. at 2131). Because the problems that Section 922(g)(1) addresses are not new, the government acknowledges that it can only prevail if it can "pinpoint evidence of 'a *distinctly similar* historical regulation addressing that problem.'" Resp. at 4 (quoting *Bruen*, 142 S. Ct. at 2131 (emphasis added)). To show a tradition of distinctly similar regulation, the government would have to demonstrate that there were historical laws that permanently denied felons the right to bear arms. Other historical firearms regulations—even if they were similar to Section 922(g)(1) in some respects—would not be sufficient to carry the government's burden under the "distinctly similar" test. *See United States v. Daniels*, No. 22-60596, 2023 WL 5091317, at *4 (5th Cir. Aug. 9, 2023) ("Although marihuana might be comparable in some ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.").

The government doesn't even try to make the required showing. As in prior cases, the government has failed to cite an example of a single historical law that permanently abridged felons' right to bear arms. *See Bullock*, 2023 WL 4232309, at *31 ("[T]he government put forth no effort to ground in history the present charges it brought again him. That is what Bruen requires."). Instead of discussing the (non-existent) history of felon disarmament, the government's brief attempts to assert that Section 922(g)(1) is "relevantly similar" to *other* firearms restrictions that existed at the time of the founding — such as laws that prohibited enslaved people, or warring Indian tribes, or Catholics from possessing arms.

There are two fundamental problems with the government's argument. *First*, the government is asking the Court to apply the wrong standard. Even if these other laws were "relevantly similar" to Section 922(g)(1), that would not suffice to carry the government's burden. Only a "distinctly similar" law would suffice.

*Second*, the laws that the government cites are not even "relevantly similar" to Section 922(g)(1). Even this less demanding standard requires the government to demonstrate that the "modern and historical regulations impose a comparable burden on the right of armed self-defense" and that the "burden is comparably justified[.]" *Bruen*, 142 S. Ct. at 2133. The government cannot make that showing either. The historical laws that the government discusses were enacted for different purposes than Section 922(g)(1) and were also less burdensome on the right to bear arms. As a result, the government cannot succeed under either of the two historical tests set out in *Bruen*. Mr. Prince will start by applying the correct "distinctly similar" standard, and he will then demonstrate

that he prevails even under the more relaxed "relevantly similar" test.

**A.    Because the government cites no evidence of any historical felon dispossession laws before the 20th Century, it has failed to demonstrate a tradition of "distinctly similar" regulations.**

Under the "distinctly similar" test, the Court's historical analysis must focus on the specific question of whether felons were traditionally deprived of the right to bear arms. As the Fifth Circuit has recently explained, "*Bruen*'s discussion of 'distinct' and 'relevant' similarity seems aimed at interpreting historical silence." *United States v. Daniels*, No. 22-60596, 2023 WL 5091317, at *5 (5th Cir. Aug. 9, 2023). In applying the "distinctly similar" test, the Court should "count silence as evidence that the public did not approve of such a regulation . . . when the public experienced the harm the modern-day regulation attempts to address." *Id.* Where silence provides direct evidence of the lack of a historical tradition, there is no need to engage in an ill-defined and speculative "analogical" inquiry.

In Mr. Prince's case, the historical silence on the issue of disarming felons speaks volumes. Felons existed in 1791, as did the problem of recidivism. *See* Jeffrey K. Sawyer, *"Benefit of Clergy" in Maryland and Virginia*, 34 Am J.L. Hist. 49, 62 (1990) (discussing colonial-era measures to deal with recidivism, such as the denial of benefit of clergy and other sentencing procedures). As a result, the "Founders themselves could have adopted" laws like Section 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they declined to do so.

The reason that the government has failed to cite any historical laws restricting firearm possession by felons is that no such laws existed. *See, e.g.*, Royce de R. Barondes,

*The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol's. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the founding); Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) (noting felon disarmament laws did not emerge until "the early part of the twentieth century"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) (same); *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 360 (3d Cir. 2016) (Hardiman, J., concurring) (dating felon dispossession statutes to 1931 and 1961); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 914-15 (3d Cir. 2020) (Bibas, J., dissenting) (concluding no founding era case or statute imposed a "near-blanket ban for all felons").

Section 922(g)(1) is not even 100 years old. It traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses[.]" *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Not until 1961 did Congress amend the statute to cover receipt by "all felons." *Skoien*, 614 F.3d at 640 (citing Pub. L. 87–342, 75 Stat. 757). Section 922(g)(1) "is firmly rooted in the twentieth century" and "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Booker*, 644 F.3d at 24.

*Bruen* provides that cases like this one should be resolved through a "straightforward historical inquiry[.]" *Bruen*, 142 S. Ct. at 2131. Because the historical record demonstrates that felons were not permanently denied the right to bear arms

before the twentieth century, the government has failed to establish the existence of a historical tradition that is "distinctly similar" to Section 922(g)(1).

> **B.** **Even if the Court applies the less exacting "relevantly similar" standard, the government has failed to meet it.**

In the absence of any historical evidence suggesting that felons were ever permanently disarmed, the government asks the Court to conduct its historical analysis at an extremely high level of generality. In particular, the government lumps together wildly disparate historical regulations in an attempt to invent a tradition that would allow the state to disarm anyone who it deemed to be an "untrustworthy adherent to the law," Resp. at 17, or who it thought would "disturb the social order," Resp. at 30, or who had a "propensity to disobey the sovereign," Resp. at 18, or who "could not be counted upon to be responsible, law-abiding members of the polity," Resp. at 30. But defining a historical tradition at that stratospheric level of generality was already explicitly rejected in *Bruen* itself.

In *Bruen*, New York attempted to save its gun law by asserting that it fell within a vaguely defined historical tradition that barred the possession of guns in "sensitive places." *Bruen*, 142 S. Ct. at 2133. New York argued that it had the power to expand the historical list of "sensitive places" to include "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* But *Bruen* rejected this argument, explaining that it would "eviscerate the general right to publicly carry arms for self-defense" by vesting the state with plenary power to determine where arms could be carried for self-defense. *Id.*; *see also Range*, 69

16

F.4th at 105 (noting that *Bruen* held that "historical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there.").

The government is attempting the same maneuver here. While New York relied on "sensitive places" as its amorphous catch-all category, the government attempts to do the same with the equally standardless category of people who it deems to be "untrustworthy adherents to the law." But this is "a mushy standard that sets no limit" at all. *Cf. Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) (discussing "felony" label). This standard would be less protective than the means-end scrutiny test that *Bruen* abrogated because it would leave the decisions about who can and who cannot bear arms entirely to the discretion of the government. Defining the historical inquiry at this lofty level of generality would allow courts and the government to "engage in independent means-end scrutiny under the guise of an analogical inquiry"—an outcome that *Bruen* specifically forbids. *Bruen*, 142 S. Ct. at 2133 n.7.

As a result, the Court should not—and cannot—engage with the government's proffered analogies by generalizing away the specific content of the historical laws at issue. Instead, "[t]o remain faithful to *Bruen*, the solution is to analyze to *particular regulatory traditions* instead of a general notion of" untrustworthiness posited by the government. *Daniels*, 2023 WL 5091317, at *14 (emphasis added). In considering each historical regulation proposed by the government, the Court "must use *Bruen*'s 'why' and 'how' analysis to assess whether the Founding-era restriction is relevantly similar to the modern one." *Id.* With that methodological point in mind, Mr. Prince turns to each of the

historical analogues that have been proposed by the government.

> i. *There is no historical tradition of disarming "untrusted groups." The examples that the government offers differ substantially from Section 922(g)(1) both in purpose and in the extent of the burden they place on the Second Amendment right.*

The government starts by attempting to analogize Section 922(g)(1) to a variety of English and colonial-era laws that disarmed racial, religious, and political minorities. *See* Resp. at 17–24. The government has tried to rely on these laws in prior cases, and its attempt has already been rejected by a variety of courts. *See, e.g., Range*, 69 F.4th at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today."); *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *12 (M.D. Pa. Aug. 22, 2023) (rejecting these same proposed analogues because "[t]he Government's conclusion rests on dangerousness as the historical "touchstone" without any explanation of how the earlier regulations compare in mechanics or purpose to Section 922(g)(1). This comparison is too broad and does not carry the Government's burden under the *Bruen/Range* standard."); *see also Rahimi*, 61 F.4th at 457 (rejecting the analogy in the context of a challenge to Section 922(g)(8)); *Daniels*, 2023 WL 5091317, at *14 (noting, in the context of Section 922(g)(3) challenge, that "[m]arihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.").

The Court should reach the same conclusion here. The government's proposed analogies fail on both metrics that the Supreme Court set out in *Bruen.* First—as to the "how"—each of the government's proffered analogues was significantly less burdensome on the right to bear arms than the total and permanent firearm ban set out in Section 922(g)(1). Not one of the laws cited by the government imposed a total, permanent ban on firearms possession. Instead, these historical laws either provided exceptions that allowed for the continued possession of some weapons or allowed their targets to take steps to regain their access to firearms.

Second—as to the "why"—the purpose and function of these historical laws were far different from the modern Section 922(g)(1). While the government attempts to lump these different regulations under the self-serving umbrella category of regulating "untrustworthy people," the historical record does not support this view. [5] Instead, as the Fifth Circuit suggested in *Rahimi*, these laws were "targeted at groups excluded from the political community—*i.e.*, written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best." *Rahimi*, 61 F.4th at 457. Specifically, each of the laws cited by the government aimed to disarm groups that the founders either regarded as subhuman or as actively engaged in organized sedition. While it should go without saying, Mr. Prince does not belong in either of those categories.

---

[5]     It should be emphasized that—in contrast to the position it has taken in other cases—the government is not arguing that these historical regulations were predicated on the risk of danger posed by these groups.

a)   Discriminatory English laws disarming Catholics do not support disarming Mr. Prince

The government's revisionist history starts with England in 1689 when the newly restored Protestant monarchy disarmed Catholics who refused to make declarations renouncing their faith. Resp. at 18.

But, as compared to Section 922(g)(1), this English law did not "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133. As the government acknowledges, the English statute permitted Catholics to retain their arms as long as they swore an oath of allegiance to the King. Resp. at 19 n.11 (citing 1 Wm. & Mary., Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (acknowledging that the English and colonial statutes had restoration provisions). Moreover, the English law also contained a self-defense exception which allowed Catholics to obtain permission to possess firearms "'for the defense of [their] House or person.'" Wm. & Mary., Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72. By contrast, Section 922(g)(1) represents a total and permanent ban on firearm ownership.

The burden imposed by the English law was also not "comparably justified" to the burden imposed by Section 922(g)(1). The government characterizes the English law as reflecting "the new government's perception that Catholics . . . could not be trusted to obey English law." Resp. at 18. This argument misrepresents the purpose of the law itself, as well as the broader context of the Glorious Revolution. In the time after the restoration of the Protestant monarchy, Catholics were regarded—not just as generically untrustworthy—but as seditious enemies of the state. *See* Clement Fatovic, *The Anti-*

*Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005) ("throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation with Catholics"). As a popular and influential seventeenth-century tract by Robert Filmer explained, "[t]he main, and indeed only point of popery is the alienating and withdrawing of subjects from their obedience to their prince, to raise sedition and rebellion[.]" Jacqueline Rose, *Robert Brady's Intellectual History and Royalist Antipopery in Restoration England*, 122 Eng. Hist. Rev 1287, 1289 (quoting Sir Robert Filmer, *Patriarcha and Other Writings* 132–3 (1991)).

In keeping with this widespread sentiment, the purpose of the 1689 law was specifically to prevent insurrection. The law itself is explicit on this point. As the preamble of the statute explains, the law was enacted, "for the better secureing of their Majestyes Persons and Government." Wm. & Mary., Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72. Because Catholic disarmament was targeted at protecting the Protestant monarchy from organized and treasonous revolt, it does not provide historical support for modern blanket regulations that permanently disarm people who have previously been convicted of committing felonies.

        b)    <u>Discriminatory colonial laws disarming the enslaved, warring Indian tribes, and religious minorities do not support disarming Mr. Prince.</u>

The government then turns to colonial laws that disarmed enslaved individuals, Indians, and religious minorities. Resp. at 20–22. None of these examples is relevant to Section 922(g)(1).

Start with the laws disarming the enslaved. Unlike Section 922(g)(1), these laws did not totally prohibit the possession of firearms. Instead, each of the laws allowed for firearm possession so long as the enslaved person had "his master's special license[.]" 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law).[6] That same fact—that masters and overseers were given the power to decide when and how enslaved persons could be armed—demonstrates that the real purpose of these laws was to maintain white supremacy. Like the rest of colonial laws addressing enslavement, this law was designed to ensure that the enslaved were constantly subject to the control and domination of their masters. To the extent that the government sees an analogy between

---

[6] *See also Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law) (firearm possession prohibited "unless his or their Owner or Owners or a white Man, by order of his or their Owner or Owners, be with the said Slave or Slaves"); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481 (1823) (1680 Va. law) (firearm possession prohibited "without a certificate from his master, mistris or overseer"); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 118 (1811) (1715 Md. Law) (forbidding taking weapons off of their master's land "without license from their said master"); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law) (forbidding possession "but in the Preference or by the Direction of his, her, or their Master or Mistress"); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law) (firearm possession forbidden "unless in the presence of some white person" or "unless such slave shall have a ticket or license in writing from his master, mistress, or overseer"); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law) (forbidding firearm possession "except [to] such Slave or Slaves who shall have a Certificate" from their owner or overseer).

that racist purpose and the present prosecution of Glen Prince, the Court should be deeply troubled.

The Indian laws that the government cites are even further afield. The vast majority of the statutes that the government cites are not about firearm possession at all. Instead, these statutes banned white colonists from *selling* weapons to Indians.[7] Even if these laws could be considered analogous to modern laws banning the unauthorized sale of guns, they have no relevance to the Court's consideration of Section 922(g).

Admittedly, the 1677 Rhode Island law is slightly more on point, in that it allowed for the confiscation of guns owned by Indians. 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law). But even this law was not a total ban on firearm possession. The statute specifically noted that Indians could possess guns if they had a "ticket or order[.]" *Id.* And even without a ticket, the law provided that Indians who were subject to confiscation should be brought before the "Governor or Deputy

---

[7]     *Laws and Ordinances of New Netherland*, *1638-1674*, at 18-19 (1868) (1639 New Netherland law) ("every Inhabitant of New Netherland . . . is most expressly forbidden to sell any Guns, Powder, or Lead to the Indians" but not penalizing Indians who possess guns); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law) (prohibiting "what person or persons soever within the collony" from "lend[ing] any Indian either peece, powder and shott"); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law) (whosoeuer shalbe found to sell, barter, or give, directly or indirectly, any gun or guns, or amunition of any kind, to any Indian or Indians); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law) (prohibiting residents of the colony from brining any "action of debt, dettinue, or other action whatsoever, for any gun or guns or ammunition, lent, sold or any ways trusted to any Indian or Indians"); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law) (making it a crime to "give to, sell, barter or exchange with any Indian or Indians whatsoever any guns").

Governor" for a hearing at which they could apparently explain and justify their reasons for firearm possession. *Id.* Section 922(g)(1), of course, contains none of those exceptions.

In addition, the purpose that motivated the passage of these Indian disarmament (or, really, non-sale) laws was also totally distinct from the justification for Section 922(g)(1). At the time that these laws were enacted, Indians were considered to be members of hostile foreign nations. As a result, "neither slaves nor Indians were understood to be a part of the 'political community' of persons protected by the Second Amendment." *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *20 (W.D. Okla. Feb. 3, 2023). Restrictions on their Second Amendment rights tell us nothing about the scope of arms-bearing permitted to those who were among "the people." *See also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) ("Neither the Indian nor the slave was a citizen of the British colonies and, accordingly, neither was entitled to the rights of English subjects.").

Finally, the government cites a single colonial-era example of disarmament based on religious intolerance. Resp. at 21-22. In particular, the government notes that when Massachusetts tried and banished the dissident preacher Anne Hutchinson in the 1630s, it also disarmed several of her supporters. But once again, this disarmament differed from Section 922(g)(1) because it was neither permanent nor unconditional. On the contrary, the full history of the Hutchinson affair demonstrates that "supporters who confessed their sins were welcomed back into the community and able to retain their arms." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

24

While the government asserts that Hutchinson's supporters were disarmed "'not because those supporters had demonstrated a propensity for violence,' but because 'the authorities concluded their conduct evinced a willingness to disobey the law,'" Resp. at 21-22 (quoting *Range*, 69 F.4th at 123 (Krause, J., dissenting)), the government once again misreads the historical record. Hutchinson's supporters represented an existential threat to the Massachusetts colony, and their teachings "would have done away with the state as it then existed." Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 638 (1937). Other scholarship cited by the government notes a widespread historical consensus that the trial of Anne Hutchinson involved "'a struggle for control of Massachusetts'" which "caried the colony to 'the verge of armed conflict.'" James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 381 (1988) (but arguing that colonial authorities overreacted and overestimated the actual strength of the group). In other words, Hutchinson's supporters were not disarmed because of simple disobedience to the law. Instead, they were disarmed because colonial leaders feared that they were participants in an organized, seditious revolt that posed a serious threat to the continued existence of the colony itself.

c) <u>Revolutionary war measures that disarmed or banished British loyalists do not support disarming Mr. Prince</u>

Moving out of the colonial period, the government then cites Revolutionary War-era laws that disarmed British loyalists "who failed to demonstrate loyalty to the emerging American government." Resp. at 22. Once again, these wartime statutes did not impose a "comparable burden" on the right to keep and bear arms when considered

against Section 922(g)(1). *Id.* at 2133. People disarmed under these wartime statutes could regain their right to bear arms at any time simply by swearing a loyalty oath. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 157 (2007). It goes without saying that Section 922(g)(1) does not give felons the ability to restore their own right to arms whenever they choose. Moreover, even when the revolutionary authorities took arms away from someone who refused the oath, that person was free to acquire new, additional firearms—unlike a § 922(g)(1) defendant. *See Marshall, supra*, at 724 (2009) (explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

Loyalty statutes also were not "comparably justified." *Bruen*, 142 S. Ct. at 2133. The loyalty statutes were a wartime measure that aimed to neutralize Loyalists who might rebel or otherwise undermine the stability of the government. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–07 (2004) (emphasis added); *see Greenlee, supra*, at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them."). In other words, those laws were not justified by a generic power to disarm the "untrustworthy" or even the "dangerous." Instead, they were justified by the specific fear of organized and seditious revolt. But that specific, limited purpose does not support the categorical and permanent disarmament of felons.

> d)  Failed proposals from the state ratification conventions do not support disarming Mr. Prince.

26

The government also points to failed proposals from the Massachusetts, Pennsylvania, and New Hampshire constitutional ratifying conventions in an attempt to bolster its historical argument. Resp. at 24–26. At the Massachusetts convention, Samuel Adams proposed that gun rights be limited to "peaceable citizens." *Id.* at 25 (internal citation omitted). In Pennsylvania, Anti-Federalists proposed guaranteeing a right to bear arms "unless for crimes committed." *Id.* at 25 (citation omitted). In New Hampshire, delegates recommended an amendment that guaranteed a right to bear arms to all except those "in actual rebellion." *Id.* at 25.

There are several problems with the government's attempt to rely on these proposals. The first—and most obvious—problem is that none of these proposals became law. *See Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023); *see also Kanter*, 919 F.3d at 455 (J. Barrett, dissenting). *Bruen* requires the government to demonstrate a "historical tradition of firearm *regulation*," *Bruen*, 142 S.Ct. at 2126 (emphasis added), and a proposal that fails to pass is not a regulation. Moreover, when the Second Amendment was promulgated and ratified, its drafters did not include any of the restrictive language from these earlier proposals. "Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended." *Daniels*, 2023 WL 5091317, at *12. As a result, the existence—and ultimate failure—of these proposals supports Mr. Prince's position, rather than the government's.

In addition, even if failed proposals could support the government's argument, *Bruen* expressly instructs judges to "doubt that three colonial regulations could suffice to show a tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2142 and 2153 ("[W]e will not

give disproportionate weight to a single state statute and a pair of state-court decisions."). The three failed proposals at issue here provide even less support than the enacted regulations considered in *Bruen*.

ii. *The mere existence of the death penalty does not authorize the government to permanently strip away a person's fundamental rights after the completion of a sentence.*

After discussing historical laws that disarmed various racial, religious, and political minorities, the government shifted to a somewhat different tack. Specifically, the government argues that the existence of the death penalty at the time of the founding supports the notion that ex-felons who have completed their punishment may still be permanently deprived of their Second Amendment rights. *See* Resp. at 26–30. In essence, the government's argument rests on the premise that the power to impose the death penalty necessarily implies a lesser power to let somebody live but permanently deprive them of their fundamental rights. But this premise is wrong—both as a matter of historical practice and as a matter of constitutional law.

Start with history. As a historical matter, the American states did not automatically punish felons with the death penalty. *See Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'") (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)). Fewer than one-quarter of felony convictions resulted in the imposition of the death penalty. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of*

28

*Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immgr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound for America: The Transportation of British Convicts To The Colonies* 1718–1775, at 21 (1987)).

Moreover, the historical evidence demonstrates that, in cases where the death penalty was not imposed, "the rights of felons serving less than life were merely *suspended* during the term of the sentence." *Id.* at 461. Indeed, actual practices at the time of the founding show that "once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold." *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting) (citing scholarly evidence). In other words, the historical record demonstrates denying a citizen's fundamental, individual rights even after the completion of punishment is the kind of restriction "that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

Aside from history, the government's attempt to use the availability of the death penalty as a justification to deny fundamental rights even *after* a punishment has been fully served runs contrary to well-established constitutional law. After all, nothing about the logic of this argument is limited to the Second Amendment context. Indeed, the government's underlying premise—that anyone who could be subject to death is necessarily subject to the permanent deprivation of their fundamental rights—would apply with equal force in the context of the First Amendment, the Due Process Clause, or any other provision of the Constitution.

The Supreme Court has expressly rejected that troubling and undemocratic notion. It has held that "the existence of the death penalty is not a license to the

Government to devise any punishment short of death within the limit of its imagination."

*Trop v. Dulles*, 356 U.S. 86, 99 (1958) (holding that it is unconstitutional to revoke the right

to citizenship as punishment for a crime). In the context of other enumerated

constitutional rights, courts have had no trouble resisting this kind of pernicious

reasoning. *See Kanter*, 919 F.3d at 461–462 (Barrett, J., dissenting) ("We wouldn't say that

the state can deprive felons of the right to free speech because felons lost that right via

execution at the time of the founding. The obvious point that the dead enjoy no rights

does not tell us what the founding-era generation would have understood about the

rights of felons who lived, discharged their sentences, and returned to society."); *see also*

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 108

(1991) (convicted felons retain First Amendment rights); *United States v. Walden*, 146 F.3d

487, 490–91 (7th Cir. 1998) (ex-felons retain Fourth Amendment rights and "[r]easonable

suspicion of criminal activity cannot be based solely on a person's prior criminal record").

There is no reason for the Second Amendment to be treated differently—and less

favorably—than these other fundamental rights. *See McDonald v. Chicago*, 561 U.S. 742,

780 (2010) (rejecting the notion that the Second Amendment is a "second-class right,

subject to an entirely different body of rules than the other Bill of Rights guarantees").

### III. The issues that the Seventh Circuit raised in *Atkinson* weigh in favor of finding Section 922(g) unconstitutional as applied to Mr. Prince

In *Atkinson*, the Seventh Circuit posed several questions that it believed would be

helpful for district courts conducting the *Bruen* analysis. *Atkinson v. Garland*, 70 F.4th 1018,

1023 (7th Cir. 2023). By way of summary, Mr. Prince turns to those questions now.

1. "Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?' *Id.*" *Atkinson*, 70 F.4th at 1023.

Crime and recidivism are age-old problems, and both certainly existed at the time of the founding. Despite that, the government has produced no evidence to suggest that the founding generation ever attempted to permanently disarm felons. The judges and scholars who have combed through the historical record have similarly found no evidence that this occurred. As a result, earlier generations addressed this persistent problem through materially different means than Section 922(g)(1).

2. "What does history tell us about disarming those convicted of crimes generally and of felonies in particular?" *Atkinson v. Garland*, 70 F.4th at 1023.

History tells us that it did not happen. While a minority of the Pennsylvania state constitutional convention proposed an amendment that would have allowed for the disarmament of (some) felons, *see supra* at 23–25, this proposal never became law. The best—and uncontested—historical evidence demonstrates that felons were not permanently forbidden from possessing firearms at any time before the middle of the twentieth century.

3. "Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons?" *Atkinson*, 70 F.4th at 1023.

No. The government has identified laws that restricted (but did not totally ban) access to firearms for enslaved people, Indians, religious minorities, and British loyalists. But these laws were not predicated on danger—much less on some amorphous notion of "untrustworthiness," as the government proposes in this case. Instead, these laws were

directed at those who were outsiders, either because they were considered sub-human or because they were considered to be potentially seditious enemies of the state.

Even if the Court regarded these regulations as being based on danger, the specific danger that the colonialists were concerned about was the danger of organized, armed sedition. That specific concern—which colonialists addressed through targeted legislation that never amounted to a permanent or unconditional denial of the right to bear arms—is not analogous to Section 922(g)(1)'s broad-brushed disarmament of all felons.

4.    "If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)?" *Atkinson*, 70 F.4th at 1023.

The government has not identified any analogous laws. Moreover, under *Bruen*'s "distinctly similar" test, this motion should be decided—not by the government's elaborate and strained analogies—but by considering the specific tradition of how felons were treated after the completion of their sentences. As discussed above, history shows that they regained the right to bear arms.

5.    "If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements?" *Atkinson*, 70 F.4th at 1023.

At this point, the government has not argued—and has, in any case, failed to demonstrate—that the historical record supports disarmament based on

32

"dangerousness." If the Court were to go down that road, it would have to consider the specific kinds of dangerousness that led to disarmament at the time of the founding. At most, the historical evidence suggests that the Founding Generation was concerned about the danger of organized insurrection and that they responded to that danger by imposing temporary and conditional firearms disqualifications. The danger posed by non-political street crime is very different from the danger posed by organized seditious revolt. As a result—even if danger were the right benchmark for analysis—the government has failed to make the required showing in this case.

In this case, there is no dispute between the parties about the kinds of evidence the Court can consider. As a result, the Court can save those issues for another day.

## CONCLUSION

is covered by the plain text of the Second Amendment. The government has failed to carry its burden to demonstrate a well-established and representative tradition of disarming individuals with felony convictions at the time of the Founding Era. For those reasons, the Court should dismiss the Indictment.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By:  /s/ Imani Chiphe
Imani Chiphe
Attorney for Glen Prince
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603 – 312-621-8300

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, <u>Imani Chiphe</u>, attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

### GLEN PRINCE'S REPLY IN SUPPORT OF MOTION TO DISMISS

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>September 11, 2023</u>, to counsel/parties that are non-ECF filers.

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director


By: <u>*s/Imani Chiphe*</u>
    Imani Chiphe


IMANI CHIPHE
Federal Defender Program
55 E. Monroe St., Suite 2800
Chicago, IL   60603
(312) 621-8300

34